IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AUDREY BARZANTY,                    )
                  Plaintiff,        )
                                    )
          vs.                       )        Civil Action No. 06-879
                                    )
VERIZON PENNSYLVANIA, INC. and      )        Judge Cercone
ALLEN M. NEMETZ,                    )        Magistrate Judge Mitchell
                  Defendants.       )


REPORT AND RECOMMENDATION

I.      Recommendation

        It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendant, Verizon Pennsylvania, Inc. (Docket No. 18) be granted and that judgment

be entered accordingly.

II.     Report

        Plaintiff, Audrey Barzanty, brings this action pursuant to 42 U.S.C. §§ 2000e to 2000e-17

(Title VII).  She alleges that Defendant, her employer, Verizon Pennsylvania, Inc. ("Verizon"),

discriminated against her on the basis of her gender when it permitted a sexually hostile work

environment to exist and when it discharged her from employment on December 21, 2004.

        Presently before this Court for disposition is a motion for summary judgment, filed by

Defendant.  For the reasons that follow, the motion should be granted.[1]

        Facts

        Plaintiff worked for Verizon (formerly Bell Atlantic-PA Inc.) from 1974 to 1981.  She

_____

        [1]The other named defendant, Allen M. Nemetz, was dismissed pursuant to stipulation on
January 22, 2007.

resigned in 1981 because she chose to stay home with her children. She was rehired by Verizon

in 1993 and worked there until her discharge in 2004. (Barzanty Dep. at 10, 131.)[2]

Plaintiff became a member of the Communication Workers of America ("Union") at the

time of her hire and remained a member of the Union throughout her Verizon employment.

Plaintiff held a leadership position in the Union during her employment and is familiar with the

terms of the Verizon-CWA collective bargaining agreement ("Agreement"). (Barzanty Dep. at

14-15.)

The Code of Business Conduct ("Code of Conduct") governs all Verizon employees,

including those represented by the Union. (Stribling Decl. Attach. B, Arb. Tr. Jt. Ex. 3.)[3]

Plaintiff received a copy of Verizon's Code of Conduct on June 16, 2004. (Barzanty Dep. at

71-72 & Ex. 3.)

In pertinent part, the Code of Conduct provides:

**A.**     **Code of Business Conduct**

***Our Individual Responsibilities***

Individually, we are a critical connection between Verizon and our business
partners. As Verizon employees, we will conduct ourselves with integrity. This
can be accomplished by meeting our responsibilities and the standards in this
code.

*As individuals, we will:*

\* \* \*

•        Take responsibility for our personal actions, honestly accounting for and

---

[2]Unless otherwise indicated, all excerpts from Plaintiff's deposition and exhibits thereto
are contained in Defendant's Appendix (Docket No. 20) Tab 1.

[3]Docket No. 20 Tab 2.

reporting our activities.

- Know and comply with Verizon's code of business conduct, policies and procedures and applicable laws and regulations and how they apply to our work responsibilities.

* * *

### *Corrective Action and Discipline*

Employees who violate company standards may be disciplined up to and including dismissal, as well as be subject to civil and criminal charges.  If misconduct occurs, Verizon is committed to taking prompt and responsive action to correct the situation and discipline responsible individuals.

* * *

### *Connecting with Company Assets*

### **Company Property**

Our shareholders trust us to manage company assets appropriately.  We will ensure that company equipment, supplies, and other assets are used for legitimate business purposes unless otherwise specifically authorized, and that we protect all tangible and intangible company property.

---

WHAT IS COMPANY PROPERTY?

Property includes, but is not limited to, equipment, supplies, real estate, tools, inventory, funds, computer systems and equipment, computer software, computer data, vehicles, records or reports, nonpublic information, intellectual property or other sensitive information and materials, and telephone, voice mail or e-mail communications.

---

* * *

### *Personal Use of Company Property*

Company property is intended to be used for business purposes. However, limited personal use may be permissible when authorized by our manager and it does not:

- Interfere with our work responsibilities or business operations.

- Involve interests in personal outside business and/or other nonauthorized organizations and activities (which may include soliciting or promoting personal commercial ventures and political or religious causes).

\* \* \*

**Integrity of Records**

Maintaining the integrity of records is essential to meeting legal and regulatory obligations, as well as demonstrating how we conduct business with all our stakeholders. Therefore, each of us is responsible for the honesty of our records.

*Working with Records*
We will prepare company records completely, accurately and truthfully. We should apply the highest standards in accurately recording (or reconciling known) data discrepancies for each transaction to make correct and timely entries and postings so that all data elements mirror physical assets. We will not knowingly prepare, maintain or provide false or misleading records or data. We will not knowingly suppress relevant information in any company record or system.

We are also responsible for accurately reporting time worked and must accurately document expenses we actually incur according to Verizon policies.

*See Also: Company Time, below*

\* \* \*

WHAT IS COMPANY TIME?

Company time is that time we spend on the job, including traveling on business, conducting business activities, or otherwise representing the company.

*Recording Time*
We will record our work time honestly, carefully, accurately and according to applicable laws.

*Use of Time/Scheduling*
We will use our work time productively and effectively. We will be on the job when scheduled and follow policies regarding work time schedules.

*Personal Use of Time*
We will not allow personal activities to inappropriately affect our use of company time. When recording time worked, we should not include time spent on personal activities.

(Barzanty Dep. Ex. 3; Stribling Decl. Attach. B, Arb. Tr. Jt. Ex. 3 at 2, 7, 33, 34.)

Verizon also issued the "Pennsylvania Outside Work Expectations," which are the local rules applicable to employees working in the Company's construction divisions that are issued annually to division employees. (Arb. Tr. at 317).[4] Plaintiff also received a copy of the Pennsylvania Outside Work Expectations on June 16, 2004. (Barzanty Dep. at 72-73 & Ex. 4.)

In pertinent part, the Pennsylvania Outside Work Expectations provide:

**TIME REPORTING**

Employees must report time worked in an accurate and timely fashion. Time sheets are to be completed at the end of the tour – it is a requirement for finishing the workday.

**COMPANY TIME**

Never conduct personal business on Company time or use Company property for personal business.

**COMPANY VEHICLES**

Company motor vehicles cannot be taken home for breaks or lunch. During working hours the vehicle must be locked and secured when working at a customer's premise or any time the vehicle is unattended. When vehicle is housed in a garage location, the vehicle must be accessible for use by others. Ignition and door keys must be in the ignition and cab door unlocked. The supervisor must have a complete set of keys (bin keys, ignition and door keys) for every truck.

(Barzanty Dep. at 72-73 & Ex. 4.)

---

[4]Unless otherwise indicated, all excerpts from the arbitration hearing are contained in Attachment A to the Stribling Declaration, Defendant's Appendix (Docket No. 20) Tab 2.

In 1999, Plaintiff became a Splicing Technician ("Splicer"), assigned to Verizon's Greensburg, Pennsylvania garage (the "Greensburg Garage"). (Barzanty Dep. at 12.) As a Splicer, Plaintiff provided installation services in connection with construction projects. (Barzanty Dep. at 13.) In or about May 2004, Allen M. Nemetz became Plaintiff's supervisor. (Barzanty Dep. at 12-13.)

Plaintiff has testified that Nemetz displayed hostility toward her by, for example, addressing her in a demeaning and condescending manner as "kiddo." (Barzanty Dep. at 20, 31, 34.) She also states that Nemetz told Ed Kuhns, a union representative, in the summer of 2004 that she would never be in the "in-charge" position (in which an employee takes the boss's job while he is off and is paid per diem for the day) as long as he was the boss. (Barzanty Dep. at 36-37.) Verizon responds that Plaintiff conceded at her deposition that the "in-charge" position was held by only one person (Mr. Huber) and that it did not rotate to any other employees, male or female. (Barzanty Dep. at 38.)

In November of 2004, Nemetz "changed [Plaintiff's] time sheet to reflect the mileage that he felt it was to go to the Carnegie Learning Center for school." (Barzanty Dep. at 43.) He did this without her knowledge or consent. Supervisors are not permitted to alter time sheets. (Arb. Tr. at 331.)

Nemetz denied having altered the time sheet when asked by his supervisor, Mr. Weidner. Plaintiff advised Mr. Weidner that she had the time sheet showing the alteration. (Barzanty Dep.

at 48.)[5]  The time sheet was ultimately readjusted to the appropriate mileage.  (Arb. Tr. at 479.)[6]

Verizon contends that this is immaterial because the time sheet Nemetz changed is not one of the

time sheets at issue in this case and because Nemetz did not make the decision to discharge

Plaintiff.

Plaintiff's November 22-24, 2004 Training

Plaintiff attended a three-three-day multiplexer or "Flashware" training on November 22,

23, and 24, 2004.  (Barzanty Dep. at 73.)  Verizon states that, because each bargaining unit

employee is guaranteed an eight-hour workday, it allotted six hours of scheduled training time for

conducting the actual training session and two hours for pay to compensate employees for travel–

up to one hour each way from the employee's normal reporting location.  (Arb. Tr. at 50, 336-37,

343.)  Plaintiff responds that it was her understanding, based upon instructions from Mr. Hall, a

former manager, that her training class was her eight-hour day and that travel back and forth was

overtime.  (Barzanty Dep. at 85.)

Under Section A5.05(a) of the Agreement, the Company could shorten the work time by

the amount of excess travel time in order to control overtime costs and avoid travel on an

overtime basis.  (Arb. Tr. at 342-43, 345.)  Verizon also provided employees with a one-hour

unpaid lunch.  (Arb. Tr. at 50, 334, 489.)

The training was held at Verizon's Learning Center in Carnegie, Pennsylvania ("Carnegie

Learning Center").  (Barzanty Dep. at 74.)  The Carnegie Learning Center is approximately 41-42

miles from the Greensburg Garage.  (Arb Tr. at 148, 335.)  Employees assigned to take a

---

[5]Pl.'s App. (Docket No. 26) Ex. 2.

[6]Pl.'s App. (Docket No. 26) Ex. 2.

Company training class have the option to either report to their normal reporting location, at which time they will be provided with a Company vehicle to drive to the training center or, if they prefer, employees may drive their own vehicle. (Arb. Tr. at 49, 339-40.)

Under Section A5.011 of the Agreement, Plaintiff's normal reporting location was the Greensburg Garage where she was regularly assigned to work. (Arb. Tr. at 337-38; Stribling Decl. Attach. B, Arb. Tr. Jt. Ex. 1.) The distance between Plaintiff's home in Ligonier, Pennsylvania and her normal reporting location was approximately 24.5 miles.

Employees are not compensated for the time spent driving between their home and their normal reporting location. (Arb. Tr. at 338.) If employees opt to use their own vehicle, they are not compensated for travel time that expands beyond what is necessary to get to the Learning Center from their normal reporting location and back at the end of the training day, i.e., they are not compensated for travel to and from their home. (Arb. Tr. at 344-49; Stribling Decl. Attach. B, Arb. Tr. Jt. Ex. 1 (Agreement Section A5.05(b)).)

Plaintiff traveled from her home in Ligonier, Pennsylvania to the Carnegie Learning Center on each day of the multiplexer training. (Barzanty Dep. at 74-75.) In doing so, she passed the Greensburg Garage. Verizon states that Plaintiff chose to travel a path from the Greensburg Garage to the Carnegie Training Center that was 69 miles even though she was aware that a shorter path was available. (Barzanty Dep. at 76.) Plaintiff responds that she chose this route because there was less traffic on that route and it was the one that she had always taken. (Barzanty Dep. at 79.)[7]

Plaintiff testified that it took her two hours to drive the 69 miles from the Greensburg

_____

[7]Pl.'s App. (Docket No. 26) Ex. 2.

Garage to the Carnegie Learning Center.  (Barzanty Dep. at 78.)  Plaintiff stated that it took her the same amount of driving time on each of the three days.  (Barzanty Dep. at 80.)

Plaintiff testified that the training on November 22, 2004 and November 23, 2004 lasted from 8:00 A.M. until 3:30 P.M., including a one hour unpaid lunch break.  (Barzanty Dep. at 81-82.)  Verizon states that, despite having spent six and one-half hours in training on November 22 and 23 and four hours in travel time for a total of 10½ hours, Plaintiff submitted time sheets for November 22 and 23 claiming pay for 12 hours–eight hours of straight time and four hours of overtime. (Barzanty Dep. at 83-84, 91-92.)  Plaintiff responds that she understood this was the proper procedure.  (Barzanty Dep. at 88.)[8]

The training class ended early on November 24, 2004, at approximately 1:30 P.M. or 2:00 P.M.  (Barzanty Dep. at 82.)  Despite having spent, at most, five hours in training and four hours traveling on November 24, Plaintiff submitted a time sheet seeking pay for 10½ hours on November 24, 2004.  (Barzanty Dep. Ex. 5.)  Plaintiff stated that she was not aware of anything in the collective bargaining agreement or in any Verizon policy that supported her submission of time sheets for 12 hours and 10½ hours, respectively, when she had in fact worked less than those amounts.  (Barzanty Dep. at 85-86.)

Plaintiff testified that the only support for her belief that she could charge the Company for eight hours of straight time for all training classes–regardless of the amount of time she actually spent in training–and then bill Verizon for four additional hours at overtime rates, is that her former supervisor, James Hall, told her that on one occasion that she could do so.  (Barzanty Dep. at 84-85.)  Plaintiff stated that there were no witnesses to the conversation, and could not

_____

[8]Pl.'s App. (Docket No. 26) Ex. 2.

9

remember when–not even the year–that he said it.  (Barzanty Dep. at 85.)

On November 30, 2004, an investigatory meeting was held to discuss Plaintiff's time sheets for November 22-24, 2004.  (Barzanty Dep. Ex. 6.)  During the meeting, Plaintiff stated that she believed she was entitled to an eight-hour day for training–even if she spent less than eight hours in training–and that all travel time–even if she had not worked 8 hours–should be at overtime rates.  (Arb. Tr. at 489.)

The West Chester Assignment

Plaintiff volunteered for an out-of-town assignment in West Chester, Pennsylvania that was set to run from December 1 to December 17, 2004.  (Barzanty Dep. at 98-99.)  The project involved twelve hour shifts running from 6:00 AM to 6:00 PM.  All of the splicing work was to be done "in the field."  (Barzanty Dep. at 100-01.)

On December 7, 2004, Plaintiff started her shift at 6:00 A.M., but returned to the Work Center at approximately 11:30 A.M.  (Barzanty Dep. at 102, 107-08.)  Plaintiff did not request permission from any supervisor to leave the field and return to the Work Center.  (Barzanty Dep. at 102-03, 108.)  Likewise, no supervisors instructed Plaintiff to leave the field to return to the Work Center.  (Barzanty Dep. at 102-03.)

Upon returning to the Work Center, Plaintiff called her husband about a personal vehicle that needed repair.  (Barzanty Dep. at 104-05.)  The call lasted between 20 and 25 minutes.  (Barzanty Dep. at 105.)  While there, Plaintiff also attempted to call her mother.

Plaintiff ended her shift on December 7, 2004 at 6:00 P.M.  (Barzanty Dep. at 107.)  Verizon states that, despite the unapproved absence from the field and calling her husband about personal matters, Plaintiff submitted a time sheet seeking 12 hours of pay for December 7, 2004.

(Barzanty Dep. Ex. 7.) Plaintiff responds that Verizon has not pointed to any reason that "approval" was required and that she utilized her allotted break time and lunch time for the 25-minute call. (Barzanty Dep. at 107.)

On December 8, 2004, Mr. Nemetz and Charles Bartoles, a local construction manager, met with Plaintiff and a Union representative to discuss the December 7 incident. (Barzanty Dep. at 111-12.) Plaintiff admitted that she returned to the Work Center to make personal calls and was told that she could face possible discipline as a result of her actions. (Arb. Tr. at 71, 246.)

Plaintiff's Personal Shopping Trip and Accident With a Verizon Vehicle on December 18, 2004

The West Chester project ended for Plaintiff on Friday, December 17, 2004. (Barzanty Dep. at 113.) Plaintiff elected to stay over on December 17, 2004, and return home on Saturday, December 18, 2004. (Barzanty Dep. at 113-14.) Verizon paid the cost of Plaintiff's December 17 lodging.

On December 18, 2004, Plaintiff checked out of the hotel shortly after 8:00 A.M. and left West Chester driving a Verizon bucket truck. (Barzanty Dep. at 118.) Verizon states that, instead of entering the Pennsylvania Turnpike–which she should have entered in order to return to the Greensburg Garage–Plaintiff instead traveled north to Pottstown, Pennsylvania to a cuckoo clock store to conduct personal Christmas shopping. (Barzanty Dep. at 119.) Plaintiff responds that she advised her supervisor, Dave Ammons, that she was going to take personal time on the way home and that he made no response. (Barzanty Dep. at 117.)[9]

---

[9]Pl.'s App. (Docket No. 26) Ex. 2.

It took Plaintiff approximately one-half hour to drive from her hotel to the cuckoo clock store, but, when she arrived, the store was not yet open. (Barzanty Dep. at 120.) Plaintiff then drove to a local diner and had breakfast while waiting for the store to open at 10:00 A.M. Plaintiff returned to the cuckoo clock store at 10:00 A.M. and did her personal shopping. Upon leaving the store in the Verizon bucket truck, Plaintiff hit and damaged another vehicle while backing out of her parking space. (Barzanty Dep. at 121.) Plaintiff testified:

Q: While you were backing out of your parking space, you hit a parked vehicle?

A: Yes.

Q: While you were operating the Verizon vehicle?

A: Yes.

Q: Again, it was a marked bucket truck with Verizon signage and logo on it?

A: Yes.

Q: And you damaged the parked vehicle, correct?

A: Yes.

Q: You put a hole in the bumper?

A: I believe so.

Q: And scratched the other car a little?

A: I believe it was the bumper....

(Barzanty Dep. at 121.)

Plaintiff testified that she never had a backing accident, or a one-day suspension for a backing accident, but that to her knowledge there is usually a suspension tied to an accident. (Barzanty Dep. at 123.) Following the accident, Plaintiff left the parking lot at approximately

10:20 A.M. or 10:25 A.M. and then drove back to the Pennsylvania Turnpike and returned to the Greensburg Garage, arriving at approximately 4:00 P.M.  (Barzanty Dep. at 124.)

Again, on December 18, Plaintiff left the hotel at 8:00 A.M. and returned to the Greensburg Garage eight hours later at 4:00 P.M.  Verizon states that, despite the fact that Plaintiff admittedly–between 8:00 A.M. and 4:00 P.M.–engaged in a personal detour, had breakfast at a diner while waiting for a store to open for business, conducted personal shopping, and hit another car with a marked Verizon vehicle–Plaintiff submitted a time sheet seeking pay for 8 hours of work–all at overtime rates.  (Barzanty Dep. at 126 & Ex. 9.)  Plaintiff responds that her supervisor, Dave Ammons, told her that she and her co-worker, Bruce Ammons, were to be given an eight-hour travel day to return.  (Barzanty Dep. at 114.)

Plaintiff admitted that it only took her five and one-half hours to travel from West Chester to the Greensburg Garage.  (Barzanty Dep. at 126.)  Asked if she performed any work for the Company on December 17, 2004, Plaintiff testified that she packed her clothes, checked and packed her truck, filled out a time sheet and put the vehicle away in a stall.  (Barzanty Dep. at 126-27.)

An investigatory meeting was held to discuss the December 18 incident.  Plaintiff admitted that she had gone to Pottstown to do personal shopping and that she had been involved in an accident while driving a Company vehicle.  (Arb. Tr. at 76-77.)

<u>The Decision to Terminate Plaintiff's Employment</u>

William Weidner, Verizon Area Manager for Construction, made the decision to discharge Plaintiff after consulting with labor relations and human resources.  (Arb. Tr. at 314-16.)  On December 21, 2004, Plaintiff was informed of the Company's decision to terminate

her employment for multiple violations of Verizon's Code of Conduct. (Barzanty Dep. at 131 & Ex. 10.)

Plaintiff states that she was placed on an anti-depressant by her Primary Care Physician after her termination. She could not stop crying. (Barzanty Dep. at 156.)[10] She sought the services of a social worker at Latrobe Hospital for counseling to work through her depression. (Barzanty Dep. at 163.)[11]

Plaintiff's EEOC Charge and Lawsuit

On November 16, 2005, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Barzanty Dep. at 176 & Ex. 11.) She alleged that her discharge from employment constituted sex discrimination, gave December 21, 2004 as the date the discrimination took place and did not check the box for a continuing action. (Barzanty Dep. Ex. 11.) Plaintiff testified in her deposition about a series of events, which she believes supports her hostile work environment claim. (Barzanty Dep. at 32-38, 42-45, 50-51, 61-62.)

Plaintiff's Grievance and the Arbitration Award

Plaintiff filed a grievance through her Union claiming that her discharge was without "just cause" in violation of the parties' collective bargaining agreement. (Stribling Decl. ¶ 2.) The arbitration hearing was held over the course of three days on July 11, 2006, September 12, 2006, and November 8, 2006. (Stribling Decl. ¶ 3.)

Arbitrator Alan A. Symonette, Esquire, issued his Opinion and Award ("Arbitration

---

[10]Pl.'s App. (Docket No. 26) Ex. 2.

[11]Pl.'s App. (Docket No. 26) Ex. 2.

Award") in July 2007. (Stribling Decl. ¶ 5.) In his Arbitration Award, Arbitrator Symonette concluded that Plaintiff's conduct in November 2004 and December 2004 violated Verizon's Code of Business Conduct, but reduced the discharge to a six-month suspension. (Stribling Decl. ¶ 5.) Plaintiff was reinstated to employment with Verizon with backpay in August 2007. (Stribling Decl. ¶ 6.)

Procedural History

Plaintiff filed this action on July 5, 2006. The complaint alleges that Verizon and Allen Nemetz subjected her to a sexually hostile work environment and terminated her employment on the basis of gender on December 21, 2004, in violation of Title VII.

By stipulation of dismissal dated January 22, 2007, Nemetz was dismissed as a party from this case (Docket No. 11). On August 31, 2007, Verizon filed a motion for summary judgment.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the

moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Verizon argues that: 1) Plaintiff failed to file her charge of discrimination with the EEOC within 300 days of her discharge on December 21, 2004 and therefore this claim is time barred; 2) the charge she did file on November 16, 2005 makes no mention of a hostile work environment and therefore she did not exhaust her administrative remedies with respect to this claim; 3) she cannot state a prima facie case of gender discrimination with respect to her discharge because she cannot point to others outside her protected class who were treated more favorably and, even if she can, it has articulated a legitimate, nondiscriminatory reason for her discharge and she has not proffered evidence from which a trier of fact could conclude that this reason was a pretext for unlawful gender discrimination; and 4) her hostile work environment claim fails because she has not demonstrated that the alleged harassment was severe or pervasive, nor has she demonstrated that it was motivated by her gender.

Plaintiff responds that: 1) she satisfied the filing requirements by submitting an intake questionnaire to the EEOC on September 19, 2005, which was within 300 days of her dismissal; 2) the intake questionnaire notified the EEOC that she was raising a claim of hostile work environment; 3) she has stated a prima facie case of gender discrimination by pointing to adverse treatment she received unlike any other male employee; and 4) she has stated a claim for hostile work environment by pointing to evidence of severe and pervasive harassment on the basis of gender directed against her by Nemetz during the eight months he supervised her, as compared to

16

her 19-year history with the Company.

Filing Charge Within 300 Days of Discriminatory Action

Under Title VII, a charge of discrimination in employment must be filed with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice. This period is extended to 300 days if the complainant also initiates a complaint with a parallel state agency. 42 U.S.C. §2000e-5(e)(1). The Court of Appeals for the Third Circuit has held that the extension applies regardless of whether the plaintiff ever files a charge with the state agency. Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1414-15 (3d Cir. 1991) (en banc). Another section of the statute states that "[c]harges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires." 42 U.S.C. § 2000e-5(b). "Neither provision defines 'charge,' which is likewise undefined elsewhere in the statute." Edelman v. Lynchburg College, 535 U.S. 106, 112 (2002).

Plaintiff was discharged on December 21, 2004. She did not file her charge of discrimination until November 16, 2005, or 330 days later. (Barzanty Dep. at 176 & Ex. 11.) Therefore, Defendant argues that her charge was not timely filed.

Plaintiff responds that her intake questionnaire, completed on September 19, 2005 (Pl.'s App. Ex. 1)[12] qualifies as her "charge" of discrimination and, since it was filed within 300 days of her termination, she contends that she met the statutory requirement. Defendant responds that the intake questionnaire does not satisfy the requirements of a "charge." It notes that the questionnaire was not signed "under penalty of perjury," but only with the statement "I hereby verify that the statements contained in this complaint are true and correct to the best of my

_____

[12]Docket No. 26.

17

knowledge, information and belief." The Court of Appeals has confirmed that this language does not satisfy the regulation's definition of "verified." <u>Buck v. Hampton Twp. Sch. Dist.</u>, 452 F.3d 256, 260-61 (3d Cir. 2006).

Pertinent EEOC regulations provide that a charge "shall be in writing and shall be verified," 29 C.F.R. § 1601.9, and define "verified" as "sworn to or affirmed before a notary public, designated member of the Commission, or other person duly authorized by law to administer oaths and take acknowledgements, or supported by an unsworn declaration in writing under penalty of perjury," 29 C.F.R. § 1601.3(a). The regulations provide that a charge should contain: 1) the name, address and telephone number of the person making the charge; 2) the full name and address of the person against whom the charge is made; 3) a clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful practice; 4) the approximate number of employees of the respondent employer; and 5) a statement disclosing whether proceedings involving the alleged unlawful employment practice have been commenced before a state or local agency charged with the enforcement of fair employment practice laws and, if so, the date of commencement and name of the agency. 29 C.F.R. § 1601.12(a).

However, the next subsection states that:

> a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of. A charge may be amended to cure technical defects or omissions, **including failure to verify the charge**, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received. A charge that has been so amended shall not be required to be redeferred.

29 C.F.R. § 1601.12(b) (emphasis added). Some courts had held that § 1601.12(b) only allows a

"charge" to be amended and that a document such as an intake questionnaire that is unverified

cannot be turned into a charge by a subsequently filed verification amendment.  See, e.g.,

Pijnenburg v. West Georgia Health Sys., Inc., 255 F.3d 1304, 1306 (11th Cir. 2001); Shempert v.

Harwick Chem. Corp., 151 F.3d 793, 796-97 (8th Cir. 1998); Park v. Howard Univ., 71 F.3d

904, 908-09 (D.C. Cir. 1995).

The Supreme Court has rejected this argument.  In Edelman, the plaintiff (Leonard

Edelman) wrote a letter to the EEOC on November 14, 1997, claiming gender-based employment

discrimination, exacerbated by discrimination on the basis of national origin and religion based

on a letter denying him tenure that was faxed to him by Lynchburg College on June 6, 1997.  An

EEOC employee advised Edelman to arrange an interview with a member of the field office.

After the interview, the EEOC sent Edelman a Form 5 Charge of Discrimination for him to

review and verify by oath or affirmation.  On April 15, 1998, 313 days after the June 6, 1997

denial of tenure, the EEOC received the verified Form 5, which it forwarded to the college for

response.  The district court found that the November 14, 1997 letter was not a "charge" because

neither Edelman nor the college had treated it as one and dismissed his claims as untimely.  The

Court of Appeals for the Fourth Circuit affirmed, concluding that the plain language of the

statute foreclosed the EEOC regulation allowing a later oath to relate back to an earlier

unverified charge.  Edelman v. Lynchburg College, 228 F.3d 503 (4th Cir. 2000).

The Supreme Court held that the two provisions of the statute–one requiring a charge to

be verified and another requiring it to be filed within a certain amount of time–did not

incorporate each other and that reading the two together would ignore the two quite different

objectives of the requirements:

The point of the time limitation is to encourage a potential charging party to raise a discrimination claim before it gets stale, for the sake of a reliable result and a speedy end to any illegal practice that proves out. The verification requirement has the different object of protecting employers from the disruption and expense of responding to a claim unless a complainant is serious enough and sure enough to support it by oath subject to liability for perjury. This object, however, demands an oath only by the time the employer is obliged to respond to the charge, not at the time an employee files it with the EEOC.

535 U.S. at 112-13 (foot notes omitted). The Court elaborated on this distinction as follows:

the verification provision is meant to provide some degree of insurance against catchpenny claims of disgruntled, but not necessarily aggrieved, employees. In requiring the oath or affirmation, however, Congress presumably did not mean to affect the nature of Title VII as "a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process." EEOC v. Commercial Office Products Co., 486 U.S. 107, 124, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); Love v. Pullman Co., 404 U.S. 522, 527, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). Construing § 706 to permit the relation back of an oath omitted from an original filing ensures that the lay complainant, who may not know enough to verify on filing, will not risk forfeiting his rights inadvertently. At the same time, the EEOC looks out for the employer's interest by refusing to call for any response to an otherwise sufficient complaint until the verification has been supplied.

Id. at 115 (footnote omitted). The Court then noted that Congress had amended Title VII several times without once casting doubt on the EEOC's construction, thereby suggesting its consent to this practice. The Court concluded by holding that the regulation is "an unassailable interpretation of" Title VII. Id. at 118. See also Philbin v. General Elec. Capital Auto Lease, Inc., 929 F.2d 321, 323-24 (7th Cir. 1991) (timely filed intake questionnaire, subsequently amended by verified formal charge, was sufficient); Peterson v. City of Wichita, 888 F.2d 1307 (10th Cir. 1989) (same); Casavantes v. California State Univ., Sacramento, 732 F.2d 1441, 1443 (9th Cir. 1984) (same).

The Supreme Court remanded the Edelman case to the Fourth Circuit. On remand, the college argued that Edelman's letter could not constitute a charge of discrimination because the

EEOC did not assign it a number, forward a copy to the college or forward a copy to the state fair employment practices agency. The Fourth Circuit rejected this argument, holding that these were failures of the EEOC to carry out its responsibilities under Title VII, which could not be held against Edelman. Edelman v. Lynchburg College, 300 F.3d 400, 404 (4th Cir. 2002). Therefore, the letter constituted the charge of discrimination raising a claim of sex discrimination. However, the court did not allow Edelman to proceed with his claims of religious and nationality discrimination, because these claims were not contained in the Form 5 charge, but only in the letter. The court held that "[i]t would be unreasonable–as well as prejudicial to the College–to allow Edelman's sworn statement on the Form 5 Charge, which does not mention religious or ethnic discrimination, to serve as a verification of those charges." Id. at 405.[13]

Defendant has not addressed the Edelman case, but instead cites a recent case in which the Court of Appeals stated that a charge of discrimination must be verified. Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256 (3d Cir. 2006). This is a true statement. However, the actual holding of the Buck case is that an employer who responds to an unverified charge from the EEOC on the merits is deemed to have waived the right to later raise the defense that the charge was unverified in federal court. Verizon was not required to respond to an unverified charge and thus the Buck case is inapplicable. The Buck case does not answer the question presented by this case, namely whether a timely-filed document that meets all of the requirements for a charge except verification can be subsequently verified by the filing of a formal charge. That question is

_____

[13]As the Supreme Court noted, EEOC practice is to "prepare a formal charge of discrimination for the complainant to review and verify, once the allegations have been clarified. The complainant must submit a verified charge before the agency will require a response from the employer. Edelman, 535 U.S. at 115 n.9.

answered in the affirmative by <u>Edelman</u>.

The Court of Appeals for the Third Circuit has held that raising the issue of the expiration of a statute of limitations is an affirmative defense and that the burden of proof "rests solely on the employer." <u>Ebbert v. DaimlerChrysler Corp.</u>, 319 F.3d 103, 108 (3d Cir. 2003) (citation omitted). Defendant has not met its burden here by contending that the intake questionnaire cannot constitute a charge of discrimination because it is unverified.

Defendant has not argued that Plaintiff's September 19, 2005 intake questionnaire was insufficient to meet the requirements of § 1601.12(b). In fact, the intake questionnaire contains sufficient information to meet all of the requirement of 29 C.F.R. § 1601.12(a): it provides Plaintiff's full name, address and telephone number, identifies Verizon as Plaintiff's employer, outlines the allegations of what she considered to be discriminatory treatment with specificity (even identifying similarly situated male employees who were treated more favorably), indicates that Verizon employs more than 100 employees, and is signed by the Plaintiff.

Rather, Defendant contends that the intake questionnaire cannot be considered a charge of discrimination solely on the grounds that it is not verified. However, as the <u>Edelman</u> case held, pursuant to § 1601.12(b), the November 16, 2005 Form 5, which is verified, can relate back to the date Plaintiff filed her intake questionnaire and amend it so that it meets all of the statutory and regulatory requirements. <u>See</u> <u>Cunningham v. Freedom Ford Sales, Inc.</u>, 2007 WL 2404739, at *2 (E.D. Pa. Aug. 17, 2007) (counsel's timely letter to EEOC met all the requirements of § 1601.12(b) and subsequent filed verified charge related back to letter and cured technical defect); <u>Christaldi-Smith v. JDJ, Inc.</u>, 367 F. Supp. 2d 756, 761 (E.D. Pa. 2005) (plaintiff's timely letter satisfied the verification requirement through the relation back of the affirmation in

her subsequently filed charge containing the same allegations of discrimination); Whelan v. Teledyne Metalworking Prods., 2005 WL 2240078, at *10 (W.D. Pa. Sep. 14, 2005) (general information statement, subsequently supplemented by verification under oath, was sufficient).

In addition, it is noted that the EEOC did not close its file because Plaintiff's charge was not timely filed, which is an option on the Dismissal and Notice of Rights form. (Barzanty Dep. Ex. 13.) This is another factor to be weighed in Plaintiff's favor. See Dubose v. District 1199C, Nat'l Union Hosp. & Health Care Employees, 105 F. Supp. 2d 403, 412 n.7 (E.D. Pa. 2000).

Defendant also argues that Plaintiff cannot maintain a sexually hostile work environment claim, because the only claim alleged on the Form 5 is sex discrimination relating to her discharge on December 21, 2004. As the Fourth Circuit held on remand in Edelman, this is an appropriate defense. The Form 5 Charge of Discrimination identified the December 21, 2004 discharge as the only issue Plaintiff wanted to bring to the agency's attention. Plaintiff did not check the box indicating that it was a continuing action and the text makes no mention of a hostile work environment. (Barzanty Dep. Ex. 11.) Since this is the document that was forwarded to Verizon for a response, it would be prejudicial to the employer to compel it to respond to claims not contained therein. Therefore, with respect to Plaintiff's hostile work environment claim, Defendant's motion for summary judgment should be granted.

Prima Facie Case of Gender Discrimination

Title VII provides that it is an unlawful employment practice for an employer to discriminate against an individual with respect to conditions of employment because of her gender. 42 U.S.C. § 2000e-2(a). In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden

analysis set forth by the Supreme Court in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802

(1973) and refined in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53

(1981).  <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 278-79 (3d Cir. 2000).

> As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court.  It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

<u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

If the employee presents a prima facie case of discrimination, the employer must

"articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

<u>McDonnell Douglas</u>, 411 U.S. at 802.  If the employer specifies a reason for its action, the

employee must have an opportunity to prove the employer's reason for the adverse employment

action was a pretext for unlawful discrimination.  <u>Id.</u> at 804.  The Court of Appeals for the Third

Circuit has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered  legitimate  reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action  (that is, the proffered reason is a pretext).

<u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Verizon argues that Plaintiff has not identified similarly situated employees who received

more favorable treatment because she cites only her own deposition testimony to establish the

nature of their infractions and because, even accepting her testimony as true, she has failed to

point to male employees who were accused of falsifying overtime, using a Company vehicle for

personal business and charging it as work time and leaving the worksite to conduct personal

Christmas shopping and charging it as work time.  However, as the Court of Appeals has

clarified, although some previous cases had created confusion by referring to favorable treatment

outside the protected group as a prima facie case element, "[u]nder McDonnell Douglas,

evidence of favorable treatment outside the protected class is not an element of a prima facie

case."  Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 939 (3d Cir. 1997) (citing

McDonnell Douglas, 411 U.S. at 802).

Morever, by way of this argument, Verizon is attempting to force Plaintiff to prove that

she was discriminated against in order to state a prima facie case.  In other words, Defendant has

referenced its proffered reason for Plaintiff's termination in the course of articulating why she

cannot state a prima facie case of discrimination.  To require Plaintiff to rebut this reason in order

to establish a prima facie case of discrimination improperly imports into the prima facie analysis

the later stages of the McDonnell Douglas test.

As cogently explained by the Sixth Circuit:

> a court may not consider the employer's alleged nondiscriminatory reason for
> taking an adverse employment action when analyzing the prima facie case.  To do
> so would bypass the burden-shifting analysis and deprive the plaintiff of the
> opportunity to show that the nondiscriminatory reason was in actuality a pretext
> designed to mask discrimination.

Wexler v. White's Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003) (en banc) (citing Cline v.

Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 2000)).  See also Thomas v.

Denny's, Inc., 111 F.3d 1506, 1510 (10th Cir. 1997) ("relying on a defendant's reasons for the

adverse employment action as a basis for ruling against a plaintiff at the prima facie stage raises

serious problems under the McDonnell Douglas framework because it frustrates a plaintiff's

ability to establish that the defendant's reasons were pretextual."); Davenport v. Riverview

Gardens Sch. Dist., 30 F.3d 940, 944 (8th Cir. 1994) ("by requiring plaintiff to disprove the

alleged conduct violations in order to establish his prima facie case, the district court essentially

required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse

employment action–in other words, to prove pretext and the ultimate issue of intentional

discrimination.  The prima facie case is not so onerous.")

Verizon cites Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001), for the

proposition that Plaintiff bears the burden of demonstrating that employees are similarly situated

and the test is "rigorous."  However, in Cronquist, the court was addressing the pretext stage of

the analysis, having assumed that she established a prima facie case and the city proffered a

legitimate, nondiscriminatory reason for disciplining and terminating her.  Id. at 926.  Plaintiff

has stated a prima facie case of gender discrimination.

Defendant's Proffered Reason

The burden of production therefore shifts to Defendant to articulate a legitimate, non-

discriminatory reason for Plaintiff's termination.  It cites the reasons identified in the December

21, 2004 Record of Employee Contacts, namely the following:

> 1) Falsification of timesheets
>     a) Charging Overtime not worked 11/22, 23, 24
>     b) Charging mileage not driven for personal car for training at the CLCC 11/22, 23, 24
> 2) Violation of work rules as follows:
>     a) Absent from job without permission 12-7-04
>     b) Conducting personal business on company time 12-7-04
> 3) Falsification of timesheet
>     a) Unauthorize[d] use of motor vehicle 12-18-04
>     b) Christmas shopping on Company time 12-18-04

(Barzanty Dep. Ex. 10.)

Defendant has met its burden of production. Therefore, Plaintiff is required to point to evidence from which the trier of fact could conclude that Defendant's proffered reason is a pretext for unlawful sex discrimination.

Plaintiff's Evidence of Pretext

Plaintiff proceeds along "Fuentes prong one" by arguing that she has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). Specifically, she contends that: male employees who falsified overtime were not discharged, male employees charged time for the training in the way she did and were not sanctioned and her supervisor was aware she was using a Company vehicle for her personal shopping and did not object. Verizon contends that her evidence is insufficient to meet her burden.

Falsifying Overtime

Plaintiff contends that four male co-workers (Bruce Huber, Clay Hogan, Dan Oliver and Todd Huddock) were also accused of falsifying overtime, but were not discharged for their infractions. (Barzanty Dep. at 23, 25, 28-30 [14].) Verizon responds that: 1) in each case, Plaintiff admits that she does not know whether the individuals in fact falsified their overtime (Barzanty Dep. at 25, 26, 29); and 2) in any event, she was not discharged solely for falsifying overtime, but for multiple violations of Verizon's Code of Conduct. With respect to her claim that Bruce Huber and Todd Huddock falsified overtime on December 17, 2004, Verizon notes that Plaintiff did not testify that they falsified overtime; she testified that "they charged time on a job site in Philadelphia while GPS showed them traveling on the Pennsylvania Turnpike." (Barzanty Dep.

_____

[14]Pl.'s App. (Docket No. 26) Ex. 2.

at 29.)  In other words, according to Plaintiff's own testimony, they identified the wrong location for where they spent the time.  Verizon further notes that, when asked what happened when this incident was investigated, Plaintiff stated "I believe it was stated that it was an honest mistake." (Barzanty Dep. at 30.)

### Hours Charged for Training

Plaintiff notes that Verizon did not do an investigation prior to her dismissal to determine the amount of miles that were driven by her in connection with the route she took from her home to the training center in November of 2004.  (Arb. Tr. at 373.)[15]  Not until after her termination did Allen Nemetz, the local manager, take a Company bucket truck and drive from the Greensburg work center the path that she took to the training center.  The mileage was 68½ miles.  The time it required was one hour and twenty minutes at a non rush hour time.  (Arb. Tr. at 371-72.)[16]  It took her 1 hour and 55 minutes to make the trip each day.  (Barzanty Dep. at 78.)

Plaintiff states that she charged the Company eight hours for the training because past precedent had always been that when you are in school, your school is your work day.  (Barzanty Dep. at 84.)  Verizon responds that she meant that her former supervisor, Mr. Hall, told her on one occasion that she could do so.  Plaintiff's own conduct and admissions contradict her contention, however, in that she testified that she charged 8 hours for training on November 22 and 23 and charged 6½ hours for training on November 24, 2004.  In any event, it is undisputed that Plaintiff charged the Company for more hours than she spent working and traveling on the dates at issue.

---

[15]Pl.'s App. (Docket No. 26) Ex. 2.

[16]Pl.'s App. (Docket No. 26) Ex. 2.

Plaintiff states that Clay Hogan was guaranteed eight hours per day during the training. Even if his travel time netted him less than the total eight hours, he was still entitled to the eight. (Arb. Tr. at 349.) The Company never held an investigatory meeting concerning Mr. Hogan's recording of his time. (Arb. Tr. at 409.)[17]

Verizon responds that the eight hours included Mr. Hogan's travel time, while it is undisputed that Plaintiff spent only six and one-half hours in training on November 22 and 23 and four hours in travel time for a total of 10½ hours, yet she submitted time sheets for November 22 and 23 claiming pay for 12 hours–eight hours of straight time and four hours of overtime. (Barzanty Dep. at 83-84, 91-92.) It also notes that having spent, at most, five hours in training and four hours traveling on November 24, 2004, Plaintiff submitted a time sheet seeking pay for 10½ hours on November 24, 2004. (Barzanty Dep. Ex. 5.)

She also contends that two maintenance splicers from Uniontown charged their time in the same manner as she did, but they were not terminated by the Company. (Barzanty Dep. at 94.)[18] Verizon responds that Plaintiff testified that she does not know what, if any, discipline the two maintenance splicers received. (Barzanty Dep. at 94.)

Personal Business on December 7, 2004

At a meeting on December 8, 2004, Nemetz accused Plaintiff of having been talking on a telephone for five hours on December 7, 2004, with her feet up on a desk twirling her hair. She

---

[17]Pl.'s App. (Docket No. 26) Ex. 2.

[18]Pl.'s App. (Docket No. 26) Ex. 2.

advised him that it was not true. (Barzanty Dep at 56-57.)[19]

Plaintiff notes that, prior to her termination, no effort was made by the Company to pull GPS records to confirm her account of what had occurred during the morning in question. (Barzanty Dep. at 58.)[20] GPS records were pulled after her termination. The data in those records supported her account of what had occurred. (Arb. Tr. at 390-92.)[21]

Verizon responds that the cited testimony confirms that Plaintiff's truck returned to the West Chester Work Center and that she made at least one 24-minute personal call. (Arb. Tr. at 390-91.)[22]

Use of Verizon Truck for Christmas Shopping on December 18, 2004

Plaintiff notes that her supervisor, Dave Ammons, was aware that she was taking personal time on the morning of December 18 to do some Christmas shopping. He was also aware that she intended to take the Company vehicle. He did not tell her not to use the Company vehicle or not to take personal time. (Arb. Tr. at 469.)[23] Verizon responds that the issue is that she charged the time as hours worked when it was personal time.

As she was backing out of a parking lot in Pottstown on the way home, Plaintiff hit a vehicle and punched a small hole in the car's bumper. She apologized to the driver, gave him the name of her supervisor, Mr. Nemetz, and his telephone number. She then called Nemetz to

---

[19]Pl.'s App. (Docket No. 26) Ex. 2.

[20]Pl.'s App. (Docket No. 26) Ex. 2.

[21]Pl.'s App. (Docket No. 26) Ex. 2.

[22]Pl.'s App. (Docket No. 26) Ex. 2.

[23]Pl.'s App. (Docket No. 26) Ex. 2.

inform him of the accident, according to procedure. She left a message on Nemetz's voice mail and then again called the gentleman driving the car to once again apologize. (Arb. Tr. at 472.)[24] She also notes that no investigatory meeting was held with respect to this incident. (Arb. Tr. at 483.)[25] Again, Verizon responds that the issue is that she charged the time as hours worked when it was personal time.

Verizon correctly notes that Plaintiff, who bears the ultimate burden of demonstrating that her discharge was the result of sex discrimination, cannot rely on her own deposition testimony to establish that she was treated unfavorably as compared to similarly situated male employees. See, e.g., Watson v. Eastman Kodak Co., 235 F.3d 851, 857 (3d Cir. 2000) (plaintiff failed to identify through extrinsic evidence his pay rate, or those of comparable employees, and he provided no evidence of the last date he received a paycheck, and thus he failed to make the required evidentiary showing to sustain his unlawful compensation claim). Indeed, Plaintiff admits that she could testify from her own knowledge only that she thought that certain male employees falsified overtime, not that they in fact did so, and she can testify only that these employees were not discharged, not that they did not receive some other form of discipline. She cannot demonstrate that Verizon's proffered reason for her discharge was a pretext for unlawful sex discrimination in this manner.[26]

---

[24]Pl.'s App. (Docket No. 26) Ex. 2.

[25]Pl.'s App. (Docket No. 26) Ex. 2.

[26]Plaintiff's counsel could have obtained information about other employees from Verizon during discovery by, for example, propounding interrogatories or calling a Rule 30(b)(6) witness. If she did so, she should cite these materials, and not Plaintiff's deposition, in her response. If she did not, her failure to do so is baffling.

Moreover, even accepting her allegations as true, Plaintiff has pointed only to male employees who may have falsified overtime, not those who also left the worksite to conduct personal business and sought pay for the time, and not those who also used a Verizon vehicle to do personal Christmas shopping and sought pay for that time. She has not pointed to a true comparator and thus has not demonstrated that her employer's proffered reason for her discharge is a pretext for unlawful gender discrimination. See Simpson v. Kay Jewelers, Inc., 142 F.3d 639, 645 (3d Cir. 1998) (a plaintiff "cannot selectively choose her comparator" in order to satisfy her burden of demonstrating that similarly situated persons were treated differently).

She challenges Verizon for not having adequately investigated her version of events until after she was terminated. However, the Court of Appeals has emphasized that "we do not sit as a super-personnel department that reexamines an entity's business decisions." Brewer v. Quaker State Oil Ref. Co., 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted). Or, as stated somewhat differently, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765.

Plaintiff has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." Id. Therefore, with respect to Plaintiff's gender discrimination claim arising out of her discharge, Defendant's motion for summary judgment should be granted.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant, Verizon Pennsylvania, Inc. (Docket No. 18) be granted.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: November 5, 2007